Following a hearing on a "Motion to Certify Class" filed in the action brought by Eddie Walton Davis, Pete Melvin McQueen, and Curtis Crews, individually and as class representatives, against Exide Corporation, the trial court, under Rule 23(b)(3), Ala.R.Civ.P., orally "certif[ied] the class."[1] We assume *Page 774 
that the class the court certified was the class the plaintiffs had requested that it certify, which was:
 "All retail customers residing in the State of Alabama who since 1991 purchased used or previously sold Exide batteries which were sold and marketed to them as new, first quality Exide batteries. Excluded from the class are all agencies of the United States, the Tennessee Valley Authority, and all other governmental units, agencies, and/or instrumentalities."
Exide petitions this Court to issue its extraordinary writ of mandamus ordering the trial court to decertify the plaintiff class.
The plaintiffs contend that Exide committed common law fraud and breached an implied contract by selling used or previously sold automobile batteries as new, first-quality batteries, and that Exide engaged in unconscionable conduct.
 "An order certifying an action as a class action is subject to review by way of a petition for a writ of mandamus. Ex parte Blue Cross Blue Shield of Alabama, 582 So.2d 469 (Ala. 1991). However, mandamus is not a writ of right; it is a discretionary writ, drastic and extraordinary in nature, to be issued only where there is 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) an absence of another adequate remedy; and 4) jurisdiction in the court from which relief is sought. Ex parte State ex rel. McKinney, 575 So.2d 1024 (Ala. 1990). In short, mandamus is not an appellate remedy for all seasons. This Court has issued its writ of mandamus upon petition of a defendant when a trial court certified a class action without any motion having been filed asking for a class to be designated or for the action to be certified and without any evidence, argument, or authorities being presented to satisfy the prerequisites for designation or certification; and when the trial court granted partial summary judgments for the plaintiffs on the issue of liability. Ex parte Blue Cross Blue Shield, supra.
 "Rule 23(a) provides four prerequisites to bringing a class action: 1) the class must be so numerous that joinder of all members is impracticable; 2) there must be questions of law or fact common to the class; 3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and 4) it must appear that the representative parties will fairly and adequately protect the interests of the class.
". . . .
 "In order to obtain class certification, the plaintiff must establish all of the criteria set forth in Rule 23(a). . . ."
Ex parte Gold Kist, Inc., 646 So.2d 1339, 1340-41 (Ala. 1994).
 "Rule 23(a) provides that one or more members of a class may sue as representative parties on behalf of all 'only if' the claims of the representative parties are typical of the claims of the class and the representatives will fairly and adequately protect the interests of the class. The proponent of the class action status bears the burden of alleging this as to each party who purports to represent a class, just as he bears the burden of proof as to each of the four (4) prerequisites of Rule 23(a). Rowan v. First Bank of Boaz, [476 So.2d 44 (Ala. 1985)]."
Ex parte Blue Cross Blue Shield, 582 So.2d 469, 475 (Ala. 1991).
What evidence was there before the trial court for it to find that the named plaintiffs, Davis, Crews, and McQueen, were members of the class of retail customers who reside in the State of Alabama and "who since 1991 purchased used or previously sold Exide batteries which were sold and marketed to them as new, first quality Exide batteries"?
Davis and Crews testified that they reside in Eufaula, Alabama; that they purchased Exide batteries from Carport Discount Auto Parts ("Carport") in Eufaula; and that these batteries were sold to them as new batteries in late 1993 and at various times in 1994. McQueen did not testify, and there is no evidence in the record indicating that McQueen resided in Alabama or that he had purchased Exide batteries that were sold to him as new batteries since 1991. The undisputed *Page 775 
evidence is that there is a 99.2% chance that the Exide batteries purchased by Davis and Crews from Carport were not "used or previously sold Exide batteries." What evidence did the plaintiffs present to show that they were within the .8% of all purchasers of the kind of Exide batteries that would make them members of the class that they purport to represent?
Davis and Crews did not testify that the Exide batteries they bought from Carport had been used or previously sold before they purchased them. Neither specified to the salesperson at Carport that he wanted an Exide battery, and each received Exide batteries, selected by the salesperson, that had a 55-month warranty. Davis was asked: "[Y]ou don't know for certain one way or the other whether the battery you bought had been used by anyone else before, do you?" Davis answered: "No, not personally I don't know. But, judging by the performance of the battery. When he [a Carport employee] told me both batteries I had bought had dead cells in them got me to wondering about them." Crews was asked: "[Y]ou personally don't know if any of these Exide batteries you bought had been previously sold to anybody else?" He answered, "All I know is that man [a Carport employee] sold me that battery as a new battery. I didn't go there [to Carport] to ask no questions, all I wanted was a new battery to crank my truck. Evidently, none of them worked. So, I got tired of buying them." The following questions were then asked to, and answered by, Crews:
 "Q. So, you don't know whether or not you got a new battery, is that right?
 "A. He [the Carport employee] sold it to me as new.
 "THE COURT: In your opinion were they new batteries or were they old batteries?
 "A. He [the Carport employee] was selling them to me as a new battery.
 "THE COURT: I know that is what he told you, but in your opinion were they old or refurbished or do you not have an opinion?
 "A. The one that I know that it had this small pole was unusual.
 "Q. But that is as far as you know about whether that was new or used; is that right?
"A. They looked new."
The salesman or salesmen at Carport who sold the Exide batteries to Davis, Crews, and McQueen (if McQueen purchased such a battery, as is alleged) did not testify at the class certification hearing. No one testified that McQueen bought a used or previously owned Exide battery that was sold to McQueen as a new battery.
Davis and Crews testified that the poles on their batteries were black. Nicholas Stratigeas, senior vice president of regional sales and branch operations for Exide, testified, "If the post [on the batteries] was black, that means the battery was most certainly new," because over 90% of the lead Exide uses is recycled lead that has been melted down. This recycled lead causes the posts to become black, because the lead oxidizes very quickly after the battery has been built. Stratigeas testified that "most of the batteries you get will have black posts when you take off the terminal protectors." This was not refuted by the plaintiffs.
Davis purchased his first Exide battery in January 1994, for his 1987 Suzuki Samurai sport vehicle. In April, the battery went dead and it was determined that it had a dead cell in it. Davis received another battery in April, and in August that battery went dead and it was determined that it too had a dead cell. Crews bought an Exide battery from Carport "the last of 1993" for a 1972 Chevrolet pickup. The truck would not crank after "two or three days." He took the battery back to Carport and received another battery that "cranked three days and it wouldn't stay up." He got another battery that "cranked then it got slow in about a week. Then it quit." The third battery, he said, had "the hot poles where you put the terminals on it would 'shooosh.' . . . It went straight down over the poles, you know where."
During Crews's testimony, the following occurred:
"THE COURT: It was too little for the — *Page 776 
 "A. (Interposing) Yes. When you buy a brand new battery the terminals, it ain't supposed to drop all the way down to the bottom. And it looked like it had been filed around the top and it didn't stay on. So, then I went to see a lawyer.
 "Q. Did you notice anything else about the terminals of the battery?
 "A. Only it was just like it had been scrubbed down on it, and one of them was painted — painted black; but, the one where they had filed it down, it was kind of like somebody had went around cleaning it up."
Exide had a policy by which, if a battery had been in a customer's possession for 90 days or less and had not "visibly been installed in a car"[2] and passed a standard performance test, it could be resold as a new, first-quality battery. According to Stratigeas, a first-quality battery is a battery that passes all of Exide's standard performance tests, which, he said, means that the battery "is brought to a full-fledged charge, the voltage is checked to make sure that it has 12.57 volts, that the electrolyte level is filled in the battery, and the extra insurance test we do is a load test. . . . A load test simulates cranking in the battery to ensure that it will have a lasting life as opposed to a short life battery." The batteries that are shipped to local branch customers, such as Carport, receive two load tests, one at the factory and the other at the branch office. These previously owned batteries are covered by a full warranty. Whether the sale of these previously owned batteries as new is common law fraud (see BMWof North America, Inc. v. Gore, 646 So.2d 619 (Ala. 1994)) or breach of an implied contract of sale or unconscionable conduct goes to the merits of the underlying action and is not before us in our determination of whether the trial court abused its discretion in certifying the class. Eisen v. Carlisle Jacquelin, 417 U.S. 156, 177-81, 94 S.Ct. 2140, 2152-54,40 L.Ed.2d 732 (1974). However, no evidence in the record indicates that these used or previously owned batteries that were sold as new had performance problems.
Exide has no way of knowing whether the batteries purchased by Davis or Crews, if those batteries could be presented in court, were previously sold batteries. When these batteries were sold to the named plaintiffs, Exide owned no part of Carport and had no control over Carport. Exide has no control over its retailers' practices in regard to which batteries they sell as first-quality batteries, nor does Exide have any control over what retailers tell customers about these batteries. Carport is not a named defendant. The plaintiffs included as fictitiously named defendants "other persons, firms, corporations, or other entities whose wrongful conduct caused or contributed to cause the injuries and damages to the Plaintiffs." However, because Carport is named as the retailer and is referred to in the testimony as the retailer from whom the plaintiffs purchased batteries, it is evident that Carport is not a fictitious defendant, because the fictitiously named defendants are further identified in the complaint by the statement that "all of [those defendants'] true and correct names are unknown to the Plaintiffs at this time, but will be substituted by amendment when ascertained."
There is no written order certifying the class in the record. However, the following comments by the trial court preceded the oral certification:
 "THE COURT: (Interposing) Well, it would stand to reason if you bought a 72-month battery and it didn't last but two weeks, there wasn't any visible reason that you can tell it was, a jury could well infer from the fact of that alone that it was one of these batteries that they sold as new that was refurbished which they have already admitted to doing.
 "[Defense counsel]: Well, Judge, we are not saying there weren't any such batteries. But, the fact that the jury could infer this could be one of the batteries is not sufficient to identify that person as a member of the class that got a battery that was in fact used and sold as first-quality. *Page 777 
 "THE COURT: Well, that could certainly be up to the trier of the facts to determine. You can draw inferences — a reasonable inference from the evidence. We are not going to have any eyewitnesses that [know] if any of the batteries were used, because y'all got the batteries back. You know, even if you could tell, we are not ever going to have one of the batteries here in court to be able to tell it. And this looks like a punitive damages case more than a compensatory, anyway.
". . . .
 "THE COURT: Well, the court is of the opinion there are several ways, you know, that would, given some thought, that we can identify the members of the class, post the notice, and if a person had an Exide battery to go bad, and he comes in in a week or two weeks or three weeks on a 72-month battery, that would certainly be prima facie evidence that maybe there was something wrong — whether it would be evidence something was wrong with the battery, it might be prima facie evidence that it was one of the refurbished batteries they took back, whatever you want to call it. I won't give it a name right now; but, it doesn't sound very good to me. So, I certify the class."
It does not appear that the trial court found that the named plaintiffs had purchased, as retail customers, used or previously sold Exide batteries that were sold and marketed to them as new, first-quality Exide batteries.[3] The trial court stated that a jury could reasonably infer that if a person bought a new battery with a "72-month" warranty and it lasted only a week to three weeks, then the battery was a refurbished battery that was sold as new. With only the evidence in the record, we cannot hold that a jury could reasonably infer that, but that goes to the merits of the case, which are beyond the scope of our concern in regard to this petition for the writ of mandamus. We can find no evidence in the record of any named plaintiff's having purchased a battery with a 72-month warranty. One of the named plaintiffs, Crews, did have batteries fail within the time limit mentioned by the trial court. The others did not. No evidence in the record indicates a difference in performance between a new battery and a previously owned battery that Exide sold as new. Stratigeas testified that 6.7% to 7% of all batteries sold as first-quality batteries are returned during the warranty period on those batteries.
 "Rule 23(a), [Ala.R.Civ.P.,] inherently mandates that the person bringing the action must be a member of the class he seeks to represent."
Amason v. First State Bank of Lineville, 369 So.2d 547, 549
(Ala. 1979) (citations omitted).
 "[I]f the named plaintiff seeking to represent the class fails to establish the requisite case or controversy, he may not seek relief on his behalf or on behalf of the class."
Ex parte Hayes, 579 So.2d 1343, 1345 (Ala. 1991).
The named plaintiffs bore the burden of proving each of the four prerequisites of Rule 23(a). Rowan v. First Bank of Boaz, supra. They, at least, did not prove that their claims were typical of the claims of the class they sought to represent. Therefore, the trial court abused its discretion in certifying the class.
The plaintiffs cite Ex parte Voyager Guaranty Insurance Co.,669 So.2d 198 (Ala.Civ.App. 1995), which involved a "conditional certification." No rehearing was sought in that case, and consequently Voyager did not petition this Court for certiorari review. The Court of Civil Appeals distinguishedVoyager from Ex parte Blue Cross Blue Shield, supra, because in Voyager, it said, the order of class certification was "merely a conditional order 'pending further discovery and procedures.' " 669 So.2d at 200. We need not address, in this opinion, whether we will *Page 778 
treat a conditional order certifying a class differently from a class-certification order such as was entered in Blue Cross
and in this case.
WRIT GRANTED.
HOOPER, C.J., and MADDOX, SHORES, and COOK, JJ., concur.
KENNEDY and BUTTS, JJ., dissent.
[1] The oral comments of the trial court made before it announced "So, I certify the class" are set out in this opinion.
[2] Stratigeas testified that this meant that there were no imprints on the poles of the battery and the cases are not imprinted with battery hold downs.
[3] If the trial court intended to find that the named plaintiffs had purchased Exide batteries that were sold to them as new batteries but were, in fact, used or previously sold batteries, such a finding, based solely on nonperformance of the batteries, was speculative, for there was no evidence that nonperformance was a characteristic of such batteries, and the only evidence in the record suggests that there was no difference in performance between a new battery and the previously owned battery that Exide sold as new.